**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| PAMELA SYLVESTER | ) | |
| | ) | Civil Action No. 08-665 |
| Plaintiff, | ) | |
| | ) | Judge Schwab |
| vs. | ) | |
| | ) | Magistrate Judge Lenihan |
| MICHAEL ASTRUE, | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY | ) | Re: Doc. Nos. 10, 12 |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

I.    RECOMMENDATION

It is respectfully recommended that Plaintiff's Motion for Summary Judgment at Doc. No. 10 be denied.  It is further recommended that Defendant's Motion for Summary Judgment at Doc. No. 12 be granted, and that the decision of the Commissioner to deny Plaintiff disability insurance benefits (DIB) and supplemental security income (SSI) be affirmed.

II.    REPORT

This is an action timely filed under the Social Security Act, 42 U.S.C. § 405 (g), to review a final decision of the Commissioner of Social Security finding that Plaintiff has the following severe impairments: degenerative disc disease of the spine, hepatitis C, affective disorders, a personality disorder, and substance abuse (Tr. 27, Finding No. 3), and that her impairments, including the substance use disorder(s), meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.  (Tr. 27, Finding No. 4.)  Therefore, because Plaintiff's impairments, including the substance use disorder(s) meet the criteria of a

listed impairment, she is under a "disability" as defined in the Social Security Act. (Tr. 29, Finding No. 5.) In addition, the ALJ found that if Plaintiff stopped the substance use, "the remaining limitations would cause more than a minimal impact on the [Plaintiff's] ability to perform basic work activities; therefore, the [Plaintiff] would continue to have a severe impairment or combination of impairments." (Tr. 29, Finding No. 6.) If Plaintiff stopped the substance use, Plaintiff "would not have an impairment or combination of impairments that meets or medically equals" a listed impairment. (Tr. 29, Finding No. 7.) Further, if Plaintiff stopped the substance use, she would have the residual functional capacity to perform medium work. "Nonexertionally, due to her mental disorders, she is limited to jobs that do not entail complex job tasks and instructions." (Tr. 29, Finding No. 8.) If Plaintiff stopped the substance abuse she "would be able to perform past relevant work as a taxi cab driver." (Tr. 30, Finding No. 9.) "Because the [Plaintiff] would not be disabled if she stopped the substance use, the [plaintiff's] substance use disorder(s) is a contributing factor material to the determination of disability. Thus, the [Plaintiff] has not been disabled within the meaning of the Social Security Act at any time through the date of this decision." (Tr. 31, Finding No. 10) (citations omitted). Plaintiff has not engaged in substantial gainful activity since alleging disability as of May 30, 2000. (Tr. 27, Finding No. 2, & Tr. 24.)

Plaintiff seeks DIB pursuant to Title II of the Social Security Act, 42 U.S.C. §§ 401-33 and SSI benefits pursuant to Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-83. To obtain DIB, she must show that she became disabled on or before her date last insured.[1] To

_____

[1]For purposes of eligibility for DIB, Plaintiff was insured through March 31, 2005. (Tr. 26, Finding No. 1.)

obtain SSI benefits, she must show only that she became disabled prior to the final decision of the Commissioner. Both parties have filed motions for summary judgment. The issue presented by this appeal is whether there is substantial evidence to support the Commissioner's findings. 42 U.S.C. § 405 (g).

A.    Procedural Background

Plaintiff protectively filed applications for DIB and SSI on March 19, 2004 alleging disability onset as of May 30, 2000. The claims were initially denied on August 10, 2004.[2] Plaintiff then filed a timely written request for a hearing. A hearing was held on March 14, 2006. Plaintiff testified and was represented by counsel, Steven F. Kessler. The disability onset date was amended at the hearing to March 29, 2003.[3] (Tr. 342.) On March 30, 2006, the ALJ denied Plaintiff's claims. On March 20, 2008, the Appeals Council denied Plaintiff's appeal of the ALJ's decision. Having exhausted her administrative remedies, Plaintiff filed this civil action seeking judicial review pursuant to 42 U.S.C. § 405(g).

B.    Relevant Facts

At the time of the ALJ's decision, Plaintiff was thirty-five years old. (Tr. 54.)

---

[2]The instant case was decided under a test program in which there is no reconsideration of the Agency's initial determination. 20 C.F.R. § 416.1406(b)(4). Therefore, the claim went directly to the hearing level.

[3]Plaintiff's Brief in Support of Motion for Summary Judgment (Doc. No. 11 at 3) reflects a disability onset date of March 29, 2004 and cites to the record at page 342. Pages 341 through 342 of the record, however, reflect the agreement between Plaintiff's counsel and the ALJ that the onset date would be amended from May 30, 2000 to March 29, 2003. (Tr. 341-42.)

She is a high school graduate with an associate's degree in word processing. (Tr. 326-27.)

On July 17, 2000, Plaintiff was seen in the University of Pittsburgh Medical Center (UPMC) emergency room after an automobile accident. (Tr. 132-33.) Plaintiff was sleeping in a vehicle when it was struck from behind. (Tr. 132.) Psychiatry consults indicated that Plaintiff would benefit from inpatient admission to Western Psychiatric Hospital for her symptoms of depression, polysubstance dependence, and psychotic symptoms; options of either voluntary admission or 302 admission (petitioned by her mother), were to be discussed. (Tr. 133.) Plaintiff complained of symptoms of heroin withdrawal on the evening prior to transfer. (Tr. 133.) She tested positive for cocaine, opiates, and benzodiazepines. (Tr. 142.)

On August 10, 2000, Plaintiff was hospitalized at UPMC McKeesport for four days due to suicidal ideation. (Tr. 143, 145.) Her sister reported that Plaintiff was often very depressed, and that in the last two months she had been using more crack cocaine than usual. (Tr. 145.) Plaintiff had been living with her sister who reported that Plaintiff would go out on a regular basis to "the crack house." (Tr. 145.) Plaintiff tested positive for benzodiazepines, opiates and cocaine. (Tr. 145.) Dr. Henry Groff, a psychiatrist, diagnosed organic effective disorder, possibly secondary to cocaine use and assessed a Global Assessment of Functioning (GAF) score of 40[4]. (Tr. 147.) On August 14, 2000, Plaintiff was discharged on no psychiatric

---

[4]A Global Assessment of Functioning (GAF) score is used to report an individual's overall level of functioning with respect only to psychological, social, and occupational functioning. A "GAF rating is within a particular decile if **either** the symptom severity **or** the level of functioning falls within the range." A GAF score of between 31 and 40 indicates:

> **Some impairment in reality testing or communication** (e.g., speech is at times illogical, obscure, or irrelevant) **OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood** (e.g., depressed man avoids friends, neglects family, and is unable to work . . .).

Diagnostic and Statistical Manual of Mental Disorders pp. 32-34 (American Psychiatric

medications. (Tr. 143.) Dr. Carlos Placci reported that Plaintiff was alert, pleasant, cognitively intact, and that she was not psychotic, depressed, nor suicidal. (Tr. 144.) He concluded that Plaintiff could go to work "at least from the psychiatric point of view." (Tr. 143.)

On April 1, 2001, Plaintiff was admitted to UPMC Braddock for drug detoxification and "for depression with suicidal ideation specifically with thoughts to take a bundle of heroin and shoot it into her arm." (Tr. 166.) Plaintiff was using heroin on a daily basis. Prior to her heroin usage, Plaintiff was using pain pills. (Tr. 166.) She stated that she had been prescribed OxyContin and Vicodin "but it go[t] to the point that she was 'eating it like candy.'" (Tr. 170.) She indicated that she started using heroin approximately one year ago. She snorted the heroin at first, and then began injecting it intravenously. She used anywhere from 2 to up to 10 bags per day. She stated that the drug use began after an automobile accident when she received a $10,000 settlement. (Tr. 169.) A drug screen was positive for opiates. (Tr. 167.) Plaintiff further reported as follows:

> I was real depressed because I was on heroin. I was using all of
> my money. I stole everything. I used all my credit cards. I moved
> in with the drug dealer so he could get drugs for me for free over
> the past three months. The whole past year has basically been one
> party.

(Tr. 166.) Dr. John Guterson diagnosed depressive disorder and opiate dependence and assessed a GAF score of 35. (Tr. 171.)

Plaintiff was discharged on April 5, 2001. (Tr. 166-67.) She reportedly maintained good control with an even affect. She denied any suicidal ideation and indicated she

---

Association, Task Force on DSM-IV (4th ed. (Text Revised) 2000) (hereinafter "DSM-IV-TR™") (emphasis in original).

5

is motivated for outpatient follow-up.  Discharge instructions specifically included no activity limitations or restrictions.  Post hospital care was arranged at Mon Yough Women's Center (Mon Yough).

On March 29, 2003, Plaintiff was voluntarily hospitalized with depression and suicidal thoughts stating "I was hoping that I would die when using," or go "over the damn bridge."  (Tr. 180, 183.)  Hospital records indicate that Plaintiff "has been using opiates."  (Tr. 183.)  She attempted suicide in the past, shooting 50 bags of heroin all at once.  (Tr. 183.)  She reported using up to 25 bags per day, detoxing herself in February 2003, and "was clean for two weeks."  (Tr. 184.)  Since this time, she reported using one bag of heroin intravenously per day.  (Tr. 184.)  With regard to detoxification, the medical record reflects the following:

> She has never been formerly treated in a detoxification program, was in Pyramid Rehabilitation, 6/01 but left two days early, was also in White Deer Run 12/01 through 1/02, completed the program and went to Charter Halfway House in Johnstown for one week noting "I made up excuses to leave."  She states she has tried going to meetings but "I don't like going there when I am dirty."  . . . Longest abstinence was for 40 days.  . . .  The patient had one prior admission to UPMC McKeesport Hospital and her prior admission here 4/01/01.  She was not compliant with outpatient follow-up at that time, however, earlier this month, did call Mon-Yough . . ..

(Tr. 184.)  She was also abusing Xanax "over the last couple of years."  (Tr. 184.)  Diagnoses included Bipolar Disorder without psychotic features, opiate abuse, and benzodiazepine abuse with a GAF score of 32.  (Tr. 185.)  A drug toxicology screen performed on April 2, 2003 was negative.  (Tr. 180.)  She was discharged on April 7, 2003 with no physical restrictions.  (Tr. 180.)  Plaintiff was medically stable at the time of discharge, denying any suicidal or homicidal ideation or intent.  (Tr. 180.)  Her prognosis was fair, contingent upon whether she complied

with outpatient treatment including rehabilitation at the Living Sober program. (Tr. 180.)

From March 2003 through June 2004, Dr. Placci opined that Plaintiff was temporarily disabled, less than 12 months, due to polysubstance abuse and depression. (Tr. 188, 190, 192, 194.)

From October 2003 through May 2004, Plaintiff treated with Dr. Melinda Campopiano. (Tr. 200-10.) On October 13, 2003, Plaintiff indicated that she used four to five bags of heroin per day, and that she used 20 bags the prior Friday. (Tr. 210.) Campopiano diagnosed opiate addiction and prescribed Subutex[5] and recommended Narcotics Anonymous (NA). (Tr. 210.) On October 27, Plaintiff reported that she used one half to one bag of heroin per day. (Tr. 209.) Suboxone[6] was prescribed and NA recommended. (Tr. 209.) On November 17, 2003, opiate addiction was still indicated with Suboxone prescribed. (Tr. 207.) On December 16, 2003, Dr. Campopiano noted that Plaintiff moved to a homeless shelter, attending NA meetings 2-3 times per week, and "used one bag of heroin yesterday." Opiate addiction was indicated and Suboxone prescribed. (Tr. 206.) On April 20, 2004, notations reflect "off Suboxone" and Plaintiff reported that she used one bag today. (Tr. 201.) Heroin addiction is noted with the order to resume Suboxone and NA. (Tr. 201.) Finally, on May 3, 2004, Plaintiff indicated she was on Suboxone, and that she "used heroin x two days, 'couple bags' each time."

---

[5]Subutex is an opioid (narcotic) medication used to treat narcotic addiction. "It works by binding to receptors in the brain and nervous system to help prevent withdrawal symptoms in someone who has stopped taking narcotics." Subutex (visited February 6, 2009), <http://www.drugs.com/subutex.html>.

[6]Suboxone is used to treat opiate addiction by producing "less euphoric ('high') effects" so that it becomes easier to abstain from the opiate. Suboxone (visited February 6, 2009), <http://www.drugs.com/suboxone.html>.

(Tr. 200.) Opiate addiction was noted along with the comment that Plaintiff "needs to go to meetings." (Tr. 200.)

On June 4, 2004, Plaintiff was referred to Lee Weinberg, M.D., for the evaluation of Hepatitis C. (Tr. 211.) She reported that physically she feels fine and that she "has been clean for about nine months." (Tr. 211, 218.)

On July 12, 2004, Plaintiff underwent a Clinical Psychological Disability Evaluation with Marvin D. Wheeler, Ph. D. (Tr. 219-225.) Before the scheduled appointment, Dr. Wheeler reviewed copies of the psychiatric discharge summaries of UPMC Braddock for April 1, 2001 through April 5, 2001, and March 29, 2003 through April 7, 2003. Plaintiff was on time for her appointment. She understood that a report of this meeting would be submitted to the Social Security Disability Office. Plaintiff reported her history of drug abuse and stated that she "didn't think she could do anything without drugs." (Tr. 219.) She described her attendance at rehabilitation programs including her 2003 admittance to the Living Sober Program in Braddock, and then to a Halfway House but was "kicked out for using." (Tr. 220.) She reported that for the past year, she has been attending a program at Mon Yough, sees a therapist every two weeks, and a psychiatrist once a month but still "has a lot of insecurity." (Tr. 220.) She takes Suboxone, one and one half tablets per day "to stay off drugs." (Tr. 220.) She denied the current use of alcohol or illicit drugs. "Mental Status Evaluation revealed a pleasant, cooperative but insecure, soft-spoken adult female who maintained eye contact." (Tr. 221.) No unusual mannerisms were noted, affect was pleasant and she denied perceptual difficulties. She was oriented to time, place and person, and her memory was in tact. She admitted to having a short temper. Dr. Wheeler diagnosed Bipolar Disorder and Opioid Dependence. (Tr. 221-22.)

He assessed a GAF of 51[7].  His statement on Plaintiff's ability to perform work-related activities was as follows:

> Ms. Sylvester's ability to carry out work-related activities such as understanding, retaining and following instructions would present some level of difficulty but her ability to sustain attention to perform simple repetitive tasks appears to be appropriate.  Her ability to tolerate the stress and pressures associated with day to day work type activities is considered poor at this time.

(Tr. 222-23.)

On August 4, 2004, Douglas Schiller, PH. D., in a Functional Capacity Assessment and Psychiatric Review Technique form, reported that the medical evidence established medically determinable impairments of Depression, Personality Disorder, and Substance Dependence.  He indicated that she "does appear to be in the earliest stages of remission."  (Tr. 241.)  Dr. Schiller reported that Plaintiff is able to carry out very short and simple instructions, and that there were no restrictions in her abilities concerning basic understanding and memory.  Concerning some of Dr. Wheeler's opinions of July 12, 2004, Dr. Schiller indicated that he viewed them "as an overestimate of the severity of the [Plaintiff']s] functional restrictions."  (Tr. 241.)  Dr. Schiller continued that Dr. Wheeler's opinions "concerning the [Plaintiff's] abilities in the areas of making occupational adjustments and making performance adjustments are not consistent with all of the medical and non-medical evidence in the claims folder."  (Tr. 241.)  Consequently, Dr. Schiller gave Dr. Wheeler's

---

[7]A GAF score of between 51 and 60 indicates:
**Moderate symptoms** (e.g., flat affect and circumstantial speech, occasional panic attacks) **OR moderate difficulty in social, occupational, or school functioning** (e.g., few friends, conflicts with peers or co-workers).
DSM-IV-TR™ pp. 32-34 (emphasis in original).

opinions "appropriate weight" and concluded as follows:

> The [Plaintiff] appears to be able to meet the basic mental demands
> of competitive work on a sustained basis despite the limitations
> resulting from her impairments.  Persons with such impairments
> are known to live in supervised settings and sustain competitive
> employment at the same time.

(Tr. 241.)

On almost a monthly basis, from June 1, 2004 until January 2, 2006, Plaintiff

again treated with Dr. Campopiano.  (Tr. 291-317.)  Dr. Campopiano consistently diagnosed

opiate addiction and continued Suboxone.  She also indicated that Plaintiff was temporarily

disabled from June 17, 2004 through December 17, 2004 due to depression and anxiety.  (Tr.

316.)  Likewise, Dr. Campopiano stated that Plaintiff was temporarily disabled from March 2006

through March 2008 due to cervical stenosis causing pain.  (Tr. 320.)  Finally, in completing a

Medical Statement Regarding Physical and Mental Abilities and Limitations for Social Security

Disability Claim, Dr. Campopiano indicated that Plaintiff could work no hours per day, was

limited to 15 minutes of standing at one time and 30 minutes of sitting at one time.  She also

indicated that Plaintiff was markedly impaired in the ability to work with others, interact

appropriately with the general public, ability to accept supervision and get along with others.[8]

(Tr. 291.)  During all of these sessions between June 2004 and January 2006, except one on

November 19, 2004, where she denied drug use (Tr. 309), Plaintiff neither reported nor denied

_____

[8]In his March 30, 2006 decision, the ALJ, taking into account  SSR 96-2p regarding the
appropriate consideration afforded to treating physician medical opinions on the nature and
severity of an impairment, the ALJ afforded Dr. Campopiano's opinion no weight because it was
not consistent with the following: 1) generally normal findings on her own physical
examinations; 2) the normal findings in other treatment records; 3) the conservative nature of the
claimant's medical care; or 4) with the claimant's own admitted daily activities.  (Tr. 30.)

using any drugs.

Plaintiff continued treatment with Dr. Placci.  (Tr. 280-84.)  On June 9, 2004, Dr. Placci noted that he believed Plaintiff was "medication-seeking and medication-dependent."  (Tr. 290.)  He also noted that she had been using too much Tylenol.  He assessed a GAF of barely 45[9].  (Tr. 290.)  On September 1, 2004, Plaintiff reported in detail to Dr. Placci that her mother committed suicide after she returned home from her last appointment on June 9th.  Dr. Placci noted that Plaintiff would need some time to work through this very painful event.  (Tr. 288.)  He also noted that Plaintiff was expecting social security disability and that she is doing nothing. (Tr. 288.)  He again assessed a GAF of 45.  (Tr. 288.)  Dr. Placci again noted in January 2005, that Plaintiff was taking Xanax, Temazepam, Suboxin and Motrin from another doctor, that she was depressed angry and contentious.  "It seems [patient] may be abusing medication."  (Tr. 285.)  On June 15, 2005, Dr. Placci reported that Plaintiff had to prostitute herself to pay some debts and that she feels guilty about this.  He continued that she "does not even consider working."  (Tr. 284.)  He assessed her GAF at 40.  (Tr. 284.)  From June 2005 to November 2005, Dr. Placci changed his initial diagnosis of Major Depression to Schizophrenia and then to Bipolar Disorder; GAF scores ranged from 35 to 50.  (Tr. 280-84.)

In September 2005, Plaintiff stated to Evan Shikora, M.D. that she "is a former heroin user, has been cleaned (sic) times two years."  (Tr. 257.)  In October 2005, she denied any psychological symptoms and admitted that she could independently perform a number of daily

---

[9]A GAF score of between 41 and 50 indicates:
**Serious symptoms** (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) **OR any serious impairment in social, occupational, or school functioning** (i.e., no friends, unable to keep a job).
DSM-IV-TR™ pp. 32-34 (emphasis in original).

activities including driving, travel, cleaning, walking and climbing stairs.  (Tr. 259.)

<u>Hearing Testimony</u>

On March 14, 2006, the Plaintiff, represented by counsel, testified at the hearing before ALJ Timothy Pace.  Plaintiff testified that she is single with no children and lives alone.  (Tr. 326.)  She can dress herself and prepare her own meals.  (Tr. 334.)  Her mother committed suicide in June 2004.  (Tr. 326.)  She indicated that the longest job she ever held was as a taxi driver for over a year.  (Tr. 327.)  She stopped working in May 2000 because of depression.  (Tr. 329.)

Regarding her history of drug abuse, Plaintiff testified that she has not used drugs for almost three years.  (Tr. 329.)  She indicated that she used "a lot" of heroine and cocaine.  She lived with a man who provided her with heroine and crack indicating that "I basically traded services with the man."  (Tr. 329.)

At the time of the hearing she did not have a driver's license; she failed to appear in court on a matter relating to a vehicular accident in which she was involved.  (Tr. 329-30.)

As to her physical limitations, she indicated that she can sit for one half hour at a time, stand for 20 minutes, walk for 20 minutes, and she can lift one half gallon of milk.  (Tr. 331-32.)

Plaintiff further testified that she has crying spells daily, has harbored suicidal thoughts since she was 10 years old, and now less frequently with medication.  (Tr. 335.)  She indicated she was sexually abused by her father and stepfather.  (Tr. 335.)  She is on Lexapro, Neurontin and Seroquel.  (Tr. 336.)

Finally, she indicated that she first tried heroin in 2000, and after using for a year,

started a rehabilitation program. (Tr. 340.) Her latest hospitalization for detoxification was in March 2003. She testified that thereafter, she went to a halfway house and slowly decreased her drug intake until she "became clean" in October 2004. (Tr. 342-43.) When questioned by the ALJ about the last time she used drugs, and whether certain dates were correct, Plaintiff testified as follows:

> I – it probably is, but I'm so lost in like time segments, it's – some – I – like everything in my mind right now could happen at the same time. I can't – it's hard for me to remember specific dates of all this stuff.

(Tr. 343.)


C.      Standard of Review

The standard of judicial review is whether the Commissioner's decision is supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson, 402 U.S. at 401; Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999) (quoting Pierce v. Underwood, 487 U.S. 552 (1988)); Smith, 637 F.2d at 970; Dobrowolsky v. Califano, 606 F.2d 403, 406 (3d Cir. 1979). "Substantial evidence" is more than a "scintilla." Jesurum v. Secretary of United States Dep't of Health and Human Servs., 48 F.3d 114, 117 (3d Cir. 1995); Stunkard v. Secretary of Health and Human Servs., 841 F.2d 57, 59 (3d Cir. 1988); Smith, 637 F.2d at 970. If supported by substantial evidence, the Commissioner's decision must be affirmed.

The Supreme Court has described a five-part test established by the

Commissioner to determine whether a person is disabled: The first two steps involve threshold determinations that the claimant is not presently working and has an impairment which is of the required duration and which significantly limits his ability to work. See 20 C.F.R. §§ 416.920(a) through (c) (1989). In the third step, the medical evidence of the claimant's impairment is compared to a list of impairments presumed severe enough to preclude any gainful work. See 20 C.F.R. pt. 404, subpt. P, App. 1 (pt. A) (1989). If the claimant's impairment matches or is "equal" to one of the listed impairments, he qualifies for benefits without further inquiry. § 416.920(d). If the claimant cannot qualify under the listings, the analysis proceeds to the fourth and fifth steps. At these steps, the inquiry is whether the claimant can do his own past work or any other work that exists in the national economy, in view of his age, education, and work experience. If the claimant cannot do his past work or other work, he qualifies for benefits. §§ 416.920(e) and (f). Sullivan v. Zebley, 493 U.S. 521, 525-26 (1990). Accord Barnhart v. Thomas, 124 S. Ct. 376, 379-80 (2003). The initial burden rests with Plaintiff to demonstrate that he is unable to engage in his past work. Stunkard, 841 F.2d at 59; Cotter v. Harris, 642 F.2d 700 (3d Cir. 1981); Dobrowolsky, 606 F.2d at 406; Rossi v. Califano, 602 F.2d 55, 57 (3d Cir. 1979). The burden then shifts to the Commissioner to show that other work exists in the national economy that he could perform. Green v. Schweiker, 749 F.2d 1066, 1071 (3d Cir. 1984). The fifth step is divided into two parts:

> First, the [Commissioner] must assess each claimant's present job qualifications. The regulations direct the [Commissioner] to consider the factors Congress has identified as relevant: physical ability, age, education, and work experience. See 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1520(f) (1982). Second, [he] must consider whether jobs exist in the national economy that a person having the claimant's qualifications could perform. 20 C.F.R. §§ 404.1520(f), 404.1566-404.1569 (1982).

Heckler v. Campbell, 461 U.S. 458, 460-61 (1983) (footnotes omitted).


D.     Arguments

Plaintiff presents two arguments in support of her position that the ALJ's decision is not supported by substantial evidence. First, Plaintiff contends that the record reflects she abstained from substances for a period of almost three years prior to the hearing, and that drug and alcohol abuse cannot be material as a matter of law if she is not actually using any substances. She argues that, in the absence of substances, her treating sources all observed the presence of serious mental health impairments and opined significant work-related limitations. Second, Plaintiff argues that "despite the obvious presence of nonexertional limitations, the ALJ decided this case without input from a Vocational Expert [VE]," and failed to follow the Third Circuit Court of Appeals' mandate that, in those rare instances when it is proper to supplant VE testimony with a Social Security ruling, the ALJ must discuss specifically the limitations presented by the medical record. Further, the Social Security Ruling relied upon by the ALJ must explicitly reflect the fact pattern presented by the Plaintiff's individual impairments and be probative as to the way in which the nonexertional limitations impact Plaintiff's ability to work, and thus, the occupational base. (Doc. No. 11 at 18-19.)

Defendant argues that substantial evidence supports the ALJ's decision that Plaintiff could return to her past work as a taxi driver in the absence of her drug addictions. The Commissioner responds to Plaintiff's above arguments as follows: First, substantial record evidence supports the ALJ's conclusion that Plaintiff had not abstained from drugs for almost three years before the March 14, 2006 hearing. Further, record medical evidence supports the

15

ALJ's conclusion that during periods of sobriety, Plaintiff's mental impairments improved significantly[10].  Second, Defendant argues that the regulations were amended on August 26, 2003 to clarify that an ALJ is not required to call a VE at Step Four of the five-part sequential analysis used to determine disability.  Instead, the regulations clearly state that the decision to call a vocational expert at Step Four is within the sole discretion of the ALJ.  (Doc. No. 13 at 18.)

E.    Analysis

1.    The ALJ's Finding that Plaintiff did not abstain from substances almost three years before the March 14, 2006 hearing is supported by substantial evidence, and Plaintiff's drug addiction is a contributing factor material to her disability determination.

According to Public Law 104-121 (P.L. 104-121), an individual is not entitled to disability benefits if alcoholism or drug addiction is "a contributing factor material to the determination that the individual is disabled."  42 U.S.C. §§ 423 (d)(2)(C); 1382c (a)(3)(J).  The Commissioner has issued regulations governing the implementation of P.L. 104-121.  First, an ALJ must determine whether a claimant would be disabled even with the limitations caused by alcoholism or drug addiction.  20 C.F.R. §§ 440.1520; 416.920.  Next, if the claimant is found to be disabled from all impairments, including the addiction, then the ALJ must determine the claimant's limitations in the absence of the addiction.  20 C.F.R. §§ 404.1535 (b)(2); 416.935 (b)(2).  If the remaining limitations are not disabling, then the claimant's addiction is a

---

[10]Plaintiff does not contest the ALJ's decision with respect to her physical impairments; consequently, Defendant's arguments are directed to the medical evidence pertaining to her mental impairments, including her drug addictions.  (Doc. No. 13 at 3.)

contributing factor material to the determination of disability.  Id.  The "ALJ must identify at least some medical evidence supporting the conclusion that a claimant no longer would be disabled if he or she stopped drinking or taking drugs."  Sklenar v. Barnhart, 195 F. Supp.2d 696, 700 (W.D. Pa. 2002) (emphasis in original)(citing Doughty v Apfel, 245 F.3d 1274, 1281 (11th Cir. 2001); Nevis v. Apfel, 2000 WL 342665, *10 (N.D. Cal. 2000); Davis v. Apfel, 1999 WL 972007, *4 (E.D.Pa. 1999)); see e.g., Reed v. Barnhart, 2008 WL 2835331 (D.N.J. 2008) (decision of Commissioner affirmed where ALJ referred to medical evidence in finding Plaintiff's mental impairments would be less severe absent drug abuse).

Here, the ALJ found that Plaintiff's impairments met § 12.04 and § 12.09 of the listings when including the effects of drug addiction.  (Tr. 27-29.)  Thereafter, the ALJ determined that Plaintiff was not disabled in the absence of drug addiction.

First, the ALJ determined that record evidence did not support Plaintiff's assertion that she abstained from substances for almost three years prior to the March 14, 2006 hearing.  This determination is supported by substantial record evidence.  Most notably, Plaintiff's hearing testimony, Brief in Support of Motion for Summary Judgment, and record medical evidence all conflict as to the last date Plaintiff abused drugs.  In Plaintiff's Brief in Support of Motion for Summary Judgment, Plaintiff contends that "[a]fter June 2004, the record reveals no evidence of continued use."  (Doc. No. 11 at 11.)  In hearing testimony, Plaintiff initially testified that the last time she used drugs was "[a]lmost three years, two and a half, three years.  Almost going on three years."  (Tr. 329.)  Giving Plaintiff every benefit of the doubt, and calculating back two and one half years to three years from the date of the March 14, 2006 hearing, Plaintiff's alleged last usage may be placed somewhere between March 2003 and

September, 2003.  Near the conclusion of the hearing, however, Plaintiff expressed that she was having difficulty "remembering specific dates of all this stuff."  (Tr. 343.)  The medical records reflect that Plaintiff reported drug use in March 2003, (Tr. 184), October 2003, (Tr. 210), December 2003, (Tr. 206), April 2004, (Tr. 201), and May 2004, (Tr. 200).  Yet, on June 4, 2004, Plaintiff reported to Dr. Weinberg that she had "been clean for about nine months."  (Tr. 211, 218.)  On almost a monthly basis from June 2004 until January 2006, Dr. Campopiano consistently diagnosed opiate addiction and continued Suboxone.  (Tr. 291-317.)  On June 9, 2004, Dr. Placci noted that Plaintiff was "medication-seeking and medication-dependent."  (Tr. 290.)  In January 2005, he noted that Plaintiff "may be abusing medication."  (Tr. 285.)[11]

Finally, in her Brief in Support of Summary Judgment, Plaintiff misstates the ALJ's March 30, 2006 decision to suggest that the ALJ agreed that Plaintiff had abstained from drug abuse after June 2004.  (Doc. No. 11 at 16.)  Plaintiff incorrectly paraphrased the ALJ when she stated that "the record fails to contain <u>any evidence of ongoing substance abuse since filing her application for benefits</u> in April 2004.  (Doc. No. 11 at 16 (citing Tr. 27) (emphasis added by Plaintiff).)  Correctly stated, the ALJ indicated that "the medical evidence does not reflect ongoing <u>admissions</u> of drug abuse since she filed her application for benefits in April 2004."  (Tr. 27(emphasis added).)  Contrary to Plaintiff's argument, the ALJ did not find that the record reflected no evidence of drug use after April 2004; instead, the ALJ pointed to numerous records identifying the diagnosis of opiate addiction.

---

[11]It is important to note that Plaintiff filed her application for DIB and SSI in March 2004; subsequent to her May 2004 appointment with Dr. Campopiano, Plaintiff neither admits nor denies using drugs except for one session in November 2004, where she denied using drugs. (Tr. 309).

Next, the ALJ pointed to record evidence demonstrating that Plaintiff would not be disabled if she abstained from drugs  First, the ALJ found that if Plaintiff stopped the substance use, Plaintiff's impairments would not meet or medically equal any of the listed impairments; specifically, Plaintiff would fail to meet the "B" criteria of §§ 12.04 and 12.08. (Tr. 29.)  The ALJ discussed discharge summaries from Plaintiff's hospitalizations.  On discharge from a four-day hospitalization in August 2000, Plaintiff was discharged on no psychiatric medications, she was alert, pleasant, and cognitively intact, she was not psychotic, depressed nor suicidal.  (Tr. 143-44.)  Discharge records reflected that she could go to work, "at least from the psychiatric point of view."  (Tr. 143.)  On discharge from another four-day hospitalization in April 2001, specifically for drug detoxification, she maintained good control with an even affect, denied suicidal ideation, and was motivated for outpatient follow-up. Discharge instructions included no activity limitations or restrictions.  (Tr. 166-67.)  Further, the ALJ properly relied on Plaintiff's Daily Activities Questionaire, History Report Forms, and Dr. Wheeler's Clinical Psychological Disability Evaluation in support of his conclusion that Plaintiff's symptoms have not resulted in the requisite marked or extreme functional limitations required to meet the "B" criteria.  (Tr. 29.)  Second, the ALJ found that if Plaintiff stopped using substances, she would have the residual functional capacity to perform medium work, and that nonexertionally, due to her mental disorders, she is limited to jobs that do not entail complex job tasks and instructions.  (Tr. 29-30.)  Again, the ALJ properly relied upon Plaintiff's discharge summaries, Dr. Wheeler's Clinical Psychological Disability Evaluation wherein Plaintiff denied

using "alcohol or illicit drugs at this time,[12]" and Plaintiff's reports of daily activities.

2.      Failure to Call VE at Step Four

Finally, Plaintiff argues that the ALJ erred in failing to call a VE at Step Four of the five-step sequential analysis in determining disability.  Plaintiff's argument incorrectly applies established precedent from the United States Court of Appeals for the Third Circuit and the Commissioner's regulations to Step Four.  Specifically, Allen v. Barnhart, 417 F.3d 396 (3d Cir. 2004), and Washington v. Heckler, 756 F.2d 959, 967 (3d Cir. 1985), involved instances where the ALJ proceeded to Step Five to determine disability.  See Allen, 417 F.3d at 401; Wahington, 756 F.2d at 964.  Here, the ALJ determined at Step Four that Plaintiff was not disabled, and consequently, was not required to proceed to Step Five.  Moreover, the Third Circuit Court of Appeals has indicated in recent unpublished opinions that a vocational expert is not required at Step Four.  Lopez v. Commissioner of Soc. Sec., 2008 WL 741042, *4 (3d Cir. 2008); Mays v. Barnhart, 2003 W. 22430186, *5 (3d Cir. 2003).  The regulations specifically provide the same.  See 20 C.F.R. §§ 404.1560 (b) (2); 416.960 (b) (2) ("We may use the services of vocational experts or vocational specialists" in determining whether you can do your past relevant work.) (emphasis added).  The regulations further provide that the Dictionary of Occupational Titles (DOT) may be consulted to assist the ALJ in determining whether a claimant may do his/her past relevant work.  20 C.F.R. §§ 404.1560(b) (2); 416.960(b) (2).  Here, the ALJ reviewed the DOT to determine how the occupation of taxi driver is generally performed in the

---

[12]In his Functional Capacity Assessment and Psychiatric Review Technique form, Dr. Schiller, considering the medical evidence and Dr. Wheeler's opinion, reported less than a month later that Plaintiff appeared "to be in the earliest stages of remission," and found that Plaintiff could "meet the basic mental demands of competitive work on a sustained basis despite her limitations."  (Tr. 241.)

national economy.  (Tr. 30-31.)  The ALJ indicated that the occupation of taxi driver was generally performed in the national economy "as requiring medium exertional tasks."  (Tr. 31.)  The ALJ then compared Plaintiff's residual functional capacity if she stopped using substances with the physical and mental demands of this work and concluded that Plaintiff would be able to perform her past work as taxi driver.  (Tr. 31.)  The ALJ did not err if failing to call a VE at Step Four and his decision is supported by substantial evidence.

III.     CONCLUSION

For the reasons stated above, it is recommended that the Motion for Summary Judgment filed by Plaintiff at Doc. No. 10 be denied.  It is further recommended that the Motion for Summary Judgment filed by Defendant at Doc. No. 12 be granted and that the decision of the Commissioner to deny Plaintiff disability insurance benefits (DIB) and supplemental security income (SSI) be affirmed.

In accordance with the Magistrate Judge's Act, 28 U.S.C. § 636(b)(1)(B) and (C), and Rule 72.1.4(B) of the Local Rules for Magistrate Judges, the parties are allowed ten (10) days from the date of service to file objections to this Report and Recommendation.  Any party

opposing the objections shall have ten (10) days from the date of service of objections to respond

thereto.  Failure to file timely objections may constitute a waiver of any appellate rights.

_____
LISA PUPO LENIHAN
United States Magistrate Judge


Dated: February 11, 2009

cc: The Honorable Arthur J. Schwab
    United States District Court Judge


    All Counsel of Record
    Via electronic filing